AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.: 6:24-mj- 1937 |
| James Bernard Grover | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 16, 2023, _____ in the county of _BREVARD/Sp. Maritime Jur._ in the _____ Middle _____ District of _Florida, and elsewhere_ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2243(a) | Sexual Abuse of a Minor in violation of 18 U.S.C. § 2243(a) |

This criminal complaint is based on these facts:

See affidavit

☑ Continued on the attached sheet.

_____
Special Agent Kevin Kaufman, FBI
*Printed name and title*

Sworn to before me over video conference and
signed by me pursuant to Fed.R.Crim. P. 4.1 and 4(d)

Date: _____ 09/05/2024 _____

_____
*Judge's signature*

City and state: _____ Orlando, FL _____

Leslie Hoffman Price, U.S. Magistrate Judge
*Printed name and title*

STATE OF FLORIDA                          CASE NO. 6:24-mj-1937

COUNTY OF ORANGE

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Kevin Kaufman, being duly sworn, do hereby depose and state as follows:

1.      As set forth in more detail below, there is probable cause to believe that James Bernard Grover ("GROVER"; DOB xx/xx/1962) committed a violation of 18 U.S.C. § 2243(a) (Sexual Abuse of a Minor) on or about May 16, 2023, within the special maritime jurisdiction of the United States.

2.      I have been a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") for the past 20 years.  I am currently assigned to the FBI Violent Crimes Against Children Task Force.

3.      I have received specialized training concerning investigations of sex crimes, child exploitation, child pornography, and computer crimes.  I have also investigated and assisted in the investigation of matters involving the possession, receipt, distribution, and production of child pornography.  During the course of my training and investigations, I have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media.  Moreover, I am a SA who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2422(b) and § 2243(a).

4.      I have participated in various training courses concerning the investigation and enforcement of federal laws related to sexual exploitation of minors and child sexual abuse material ("CSAM"), including crimes in which computers are

used as the means for exploiting minors and receiving, transmitting, and storing CSAM. Additionally, I have participated in the execution of search warrants involving searches and seizures of computers, computer equipment, software, and electronically stored information.

5.      I make this affidavit based on my experience and background as a law enforcement officer, including my experience with the FBI; my personal participation in the investigation; information provided by other FBI Special Agents who participated in this investigation with me, and other law enforcement officers and agency personnel.

6.      Because this affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not set forth every fact learned during the course of this investigation.

## **STATUTORY AUTHORITY**

7.      18 U.S.C. § 2243(a) provides:

> Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency, knowingly engages in a sexual act with another person who - -
>
>> (1) has attained the age of 12 years but has not attained the age of 16 years; and
>>
>> (2) is at least four years younger than the person so engaging;
>
> or attempts to do so, shall be fined under this title, imprisoned not more than 15 years, or both.

8.      18 U.S.C. § 7 defines the term "special maritime and territorial

jurisdiction of the United States" to include the following:

> (1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.
>
> . . . .
>
> (8) To the extent permitted by international law, any foreign vessel during a voyage having a scheduled departure from or arrival in the United States with respect to an offense committed by or against a national of the United States.

9.      18 U.S.C. § 2246(2) defines "sexual act" as follows:

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;
>
> (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;
>
> (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or
>
> (D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

10.     Carnival Cruise Line is an international cruise line with headquarters in

Doral, Florida.

## PROBABLE CAUSE

11.     On July 25, 2024, the FBI received a complaint of a sexual act with a child-victim (CV1; DOB xx/xx/2008) in the special maritime and territorial jurisdiction of the United States by an adult male identified as GROVER.  The complaint was submitted by CV1'S mother and was also reported to the Sanford Police Department ("SDP") on June 5, 2024.  CV1 reported to law enforcement officers that he was sexually assaulted by GROVER while on a Carnival Cruise Line cruise, which sailed on May 15, 2023.  As part of the investigation, CV1 was forensically interviewed by law enforcement officers.

## FORENSIC INTERVIEW OF CV1

12.     During the forensic interview, CV1 stated that he had volunteered for approximately three and a half years at an organization headquartered in Sanford, Florida, that helps and advocates for children with special needs and disabilities ("the ORGANIZATION").  GROVER is the listed founder and executive director of the ORGANIZATION and maintains a business office located at the Seminole Towne Centre Mall in Sanford, Florida ("the BUSINESS OFFICE").  While volunteering at the ORGANIZATION and attending related events, CV1 stated that GROVER would often hug him and "smack" CV1 on the buttocks over his clothes. On one occasion, CV1's mother observed GROVER smack CV1's buttocks, and CV1's mother confronted GROVER and told GROVER his actions were inappropriate.  CV1 stated that GROVER stopped smacking CV1 on the buttocks

4

briefly after CV1's mother confronted him, but GROVER later started doing it again at future ORGANIZATION events.

13.     CV1 stated that GROVER took CV1 on two commercial cruises. During the first cruise, CV1 stated that nothing "weird" happened.

14.     The second cruise set sail on May 15, 2023, from Port Canaveral, Florida, and on the second day of this cruise – May 16, 2023 – GROVER gave CV1 a razor as a gift. GROVER then asked CV1 if CV1 wanted GROVER to teach him how to use the razor. CV1 said "yes," and GROVER told CV1 to pull down his pants. CV1 responded to GROVER, "No that's weird." GROVER explained to CV1 that the razor was for the purpose of shaving CV1's pubic hair.

15.     CV1 then pulled down his pants exposing his genital and pubic area to GROVER, who shaved part of CV1's pubic hair above his penis and under his testicles. CV1 then trimmed the rest of his pubic hair in the area.

16.     Once CV1 finished shaving his pubic hair, GROVER told CV1 that CV1 needed to put oil on the shaved area. GROVER left the room, retrieved baby oil, returned, and proceeded to rub baby oil on CV1's testicles. CV1 told law enforcement officers that GROVER "rubbed my balls and shaked it" for approximately one minute. According to CV1, GROVER put oil on CV1's penis and "stroked it" approximately three times. GROVER told CV1 that he was done, and CV1 pulled up his pants and went to play basketball. CV1 described the razor as being black and green, and the type of razor that is commonly used to trim hair on a person's head.

17.     CV1 attended counseling sessions with GROVER approximately once a week at the BUSINESS OFFICE. CV1 stated that he recalled a time when GROVER was conducting a therapy session with CV1. During the session, GROVER stated he had to go somewhere, and GROVER left and returned with computer tablet that GROVER gave CV1, and the computer tablet contained pornography. CV1 described the pornography as being images of a "bunch of naked girls." CV1 believed GROVER gave him the tablet with the pornography so that CV1 would masturbate. CV1 stated that GROVER often talked about sex during their counseling sessions and often asked CV1 if he watched pornography, including on that particular day. GROVER's talk about pornography with CV1 made CV1 feel "weird" and "uncomfortable." CV1 believed that GROVER had done this with other child victims, and believed GROVER's son was also a possible victim because GROVER stated he also taught his son how to shave. Additionally, CV1 stated he believed another child victim, CV2 (DOB xx/xx/2005), was also a victim of GROVER because CV1 often observed GROVER whisper in CV2's ear.

18.     CV1 told law enforcement officers that he reported GROVER's sexual abuse because CV1 confided in his girlfriend. CV1's girlfriend told CV1 to tell his mother what GROVER had done to him. CV1 reported the incident to his mother and CV1's mother contacted law enforcement.

19.     Based on the allegations, CV1's mother also contacted CV2's mother and explained that CV1 had been sexually abused by GROVER. CV2's mother spoke with CV2, and CV2 told his mother that he had also been sexually assaulted

6

by GROVER. CV2's mother reported the incident to the Volusia County Sheriff's Office ("VCSO") on June 17, 2024.

**FIRST FORENSIC INTERVIEW OF CV2**

20.    On June 26, 2024, law enforcement officers forensically interviewed CV2. Law enforcement officers asked CV2 if he knew why he was being interviewed. CV2 responded that he had been "sexually assaulted" by GROVER.

21.    CV2 stated that he met GROVER at a shopping mall in approximately December of 2021 while CV2 was volunteering at the ORGANIZATION. At the time, CV2's mother owned and operated a business located in the mall near the BUSINESS OFFICE. During workdays, CV2's mother would frequently bring CV2 to the mall so CV2 could volunteer at the ORGANIZATION and BUSINESS OFFICE during her work hours.

22.    CV2 advised that prior to and while living with his mother, CV2 would visit GROVER's residence located in Deltona, Florida (the "RESIDENCE"), for brief visits, and also occasionally spent the night. CV2's visits to the RESIDENCE would occasionally be multiple days in a row. For example, CV2 told law enforcement officers that it was common for CV2 to stay at the RESIDENCE from Friday until Sunday, and CV2 would also stay at the RESIDENCE for additional consecutive days during the summer when CV2 was not in school. CV2 confirmed that he knew GROVER's address in Deltona, Florida. CV2 told law enforcement officers that he had been to the RESIDENCE a multitude of times, and that

7

GROVER was even in the process of adopting CV2 in the past, which never ultimately happened.

23.     According to CV2, around May of 2022 (when CV2 was a minor) GROVER told CV2 that GROVER was going to take CV2 on a commercial cruise as a "reward" for CV2's volunteer work at the ORGANIZATION.  GROVER stated that the cruise was a three-day trip from Florida to Nassau, The Bahamas, and back. CV2 and GROVER were accompanied one the cruise by some of GROVER's adult friends, but GROVER and CV2 stayed together in a shared room.

24.     CV2 stated the room consisted of two separate beds.  After the first night, GROVER moved the two beds together, telling CV2 that GROVER feared CV2 might fall to the ground in his sleep if the two beds were not pushed together. Shortly after GROVER and CV2 laid down to go to sleep on the second night of the cruise, CV2 stated that GROVER began physically touching CV2.  According to CV2, GROVER started rubbing CV2's buttocks and "dick" while the two were in bed.  CV2 further explained that GROVER grasped CV2's "dick" and began to "stroke" it for a couple of minutes.  CV2 said that he attempted to push GROVER away but was unsuccessful.  After a couple of minutes, CV2 explained, GROVER stopped physically touching CV2, and both went to sleep.  CV2 did not recall hearing GROVER say anything to CV2 during this incident, and mentioned he did not recall GROVER attempting to penetrate CV2 in any way.  According to CV2, this was the only sexual act that GROVER performed on him during the cruise, and GROVER made no further attempts.  CV2 told law enforcement officers that he never talked to

GROVER about the incident, but GROVER seemed to be "standoffish" for the remainder of the cruise as described by CV2.

25.     In approximately August of 2022 (when CV2 was still a minor), CV2 stayed with GROVER at the RESIDENCE for the first time.  At the time, GROVER's brother and GROVER's mentally diminished adopted son were residing with GROVER, and both had their own bedrooms at the RESIDENCE.  CV2 had already met GROVER's adopted son in the past during his assistance with the ORGANIZATION.  CV2 believed GROVER's adopted son, who is an adult, has a mental state of someone approximately fourteen years old.

26.     During CV2's first stay at the RESIDENCE, GROVER asked CV2 to stay in GROVER's bedroom.  Despite CV2 saying GROVER's request was formed like a question, CV2 stated that he felt as if he did not have an option, so CV2 agreed to stay with GROVER in GROVER's bedroom.  Later into CV2's first night at the RESIDENCE, CV2 took a shower in the bathroom within the GROVER's bedroom. After completing his shower, CV2 stated that GROVER was "waiting for him." While CV2 was still in the bathroom, GROVER approached CV2 and began to physically touch CV2's buttocks and penis.  Shortly after GROVER began touching him, CV2 stated that GROVER "put his mouth on my penis."

27.     CV2 stated that the sexual act in GROVER's bathroom lasted for approximately two to three minutes.  CV2 told law enforcement officers that GROVER stopped performing the sexual act when CV2 pushed GROVER off of him.  CV2 stated that he did not recall GROVER verbalizing anything to CV2, and

CV2 said that GROVER made no attempts to penetrate CV2 in any way. After CV2 pushed GROVER off of him, CV2 stated that he got dressed, left GROVER's bedroom, and decided to sleep on a couch in the living room instead of GROVER's bedroom.

28.     According to CV2, from around August of 2022 and until approximately February of 2024, GROVER touched CV2's buttocks and penis approximately twenty times, and all of these sexual contacts occurred at the RESIDENCE. CV2 stated that each sexual contact GROVER made with him were similar and would always occur in GROVER's bedroom or the bathroom in GROVER's bedroom. The physical acts GROVER performed on CV2 never progressed further than oral sex, stroking CV2's penis, or touching CV2's buttocks. CV2 made it clear he did not recall GROVER requesting CV2 do anything to GROVER in return, and CV2 did not recall ever being penetrated in any way by GROVER during these incidents. CV2 stated that GROVER placed his mouth on CV2's penis approximately four times during the approximately twenty incidents.

29.     CV2 told law enforcement officers that GROVER and CV2's mother seemed to have a great relationship, which led CV2 to worry about reporting GROVER's sexual acts on him to anyone. Additionally, GROVER had told CV2 that nobody would believe CV2 if CV2 ever came forward with accusations against him. GROVER further threatened CV2 by telling him that CV2's family would abandon CV2 if CV2 made accusations against GROVER. These comments by GROVER led CV2 to believe people would think he was "crazy" if CV2 ever

10

reported GROVER's conduct, and CV2 feared he would end up in a random foster home if CV2 ever reported what occurred. CV2 added that GROVER would commonly provide CV2 with cigarettes and vape pens.

30. In February of 2024, CV2's mother moved her business to a new location. It was around this time that CV2 had his last physical or verbal contact with GROVER.

## INTERVIEW OF GROVER

31. On July 2, 2024, SPD and VCSO made contact with GROVER in Sanford, Florida, and the following is a summary of the non-custodial interview with GROVER.

32. GROVER stated that he runs an advocacy support center for special needs children (i.e., the ORGANIZATION) in Sanford, Florida, and works with parents and schools. GROVER stated he has never been alone with any child except CV2. GROVER was then questioned about CV1. GROVER then remembered that he went on a cruise with CV1. GROVER also remembered that CV1 and GROVER were alone in his therapy rooms located at his old office and new office (the BUSINESS OFFICE), which both contained cameras. GROVER stated the cameras constantly recorded and claimed that the recorded videos stayed on the system for approximately three days, unless saved to a hard drive.

33. GROVER stated that he and CV2 have known each other for approximately three and a half years, and GROVER met CV2 during a gift-wrapping event at the mall. After being acquainted, CV2 began volunteering for the

ORGANIZATION and at the BUSINESS OFFICE, and frequently assisted
GROVER. Before a VCSO detective began questioning GROVER as to allegations
of sexual misconduct, GROVER stated he felt CV2 thrived on attention, and that
CV2 was quite lazy and useless unless CV2 received adequate attention. GROVER
then mentioned he believed CV2 is not happy at CV2's current residence, and
believed this is why CV2 might be making any type of allegations against GROVER.

34.     GROVER stated there was a time that CV2 stayed with GROVER at
the RESIDENCE for multiple weeks, and GROVER estimated approximately eight
weeks consecutively. Additionally, after this eight-week period, CV2 stayed the
night with GROVER for multiple days at a time. GROVER has an adopted son,
who is also diagnosed with autism and has the mental state of a juvenile. GROVER
stated that CV2 stayed with him to spend time with GROVER's adopted son. When
CV2 stayed at the RESIDENCE, CV2 stayed in a spare bedroom and did not stay
with GROVER in his bedroom.

35.     GROVER confirmed that CV2 used GROVER's shower inside of his
bedroom, and stated that CV2 used that shower because GROVER's brother was
handicapped and needed the other bathroom in the RESIDENCE to be accessible if
he needed to use it. GROVER stated that there were times where he was inside of
his room while CV2 used GROVER's shower, but GROVER advised that the
bathroom door was always closed. GROVER denied ever seeing CV2 naked or
changing his clothes before, during, or after any of CV2's showers. GROVER stated
that CV2 sometimes sat on GROVER's bed with him to watch Netflix, but

GROVER claimed that the two stayed above the covers and did not lay down on the bed together.

36.     GROVER told law enforcement officers that the door to GROVER's bedroom would be closed while the two were in his room because both of them smoked, and GROVER did not want the smoke getting into the rest of the RESIDENCE.  GROVER advised that CV2 brought breakfast to him in the morning inside GROVER's bedroom, but outside of that and the other mentioned incidents, CV2 would not be inside of GROVER's bedroom.  GROVER stated that the only physical contact he had with CV2 involved GROVER hugging CV2, and GROVER denied any other touching of CV2.

37.     GROVER was then informed of the allegations CV2 made regarding GROVER's sexual contact with CV2, and GROVER denied ever touching CV2 in any sexual manner.  GROVER said he only had one conversation with CV2 that was sexual in nature, and stated it was in relation to CV2 masturbating.  GROVER had been made aware by one of CV2's foster parents that CV2 had been masturbating, and after hearing this, GROVER stated that he had an in-depth conversation with CV2 about masturbation.  GROVER advised it was educational and the conversation was not had for any other illicit reason.  GROVER further mentioned he believed CV2 was making allegations against him because CV2 wanted attention and wanted to avoid work.  GROVER claimed that CV2 is not an honest person and has a history of lying.

13

38.     GROVER told law enforcement officers that he thought it was odd CV2 and CV1 were both making allegations against him at the same time, and alluded to there being a potential connection between CV2's and CV1's parents and the allegations.  GROVER mentioned, however, that CV1's and CV2's parents are not friends, and neither are CV1 and CV2.

39.     Regarding the cruise, GROVER confirmed he took CV2 on a three-day cruise approximately three years ago.  During this cruise, GROVER and CV2 were in the same room, but stayed in separate beds.  GROVER adamantly denied pushing the beds together at any point during the cruise, and specifically mentioned the employees on the ship would have thought it was odd if he did that.  GROVER denied any sexual touching of CV2 while on the cruise.  Towards the end of the interview, law enforcement officers specifically asked GROVER if he physically touched CV2's penis, which GROVER denied.  Officers then asked GROVER if he ever performed oral sex on CV2, which GROVER denied.

## INTERVIEW OF CV3

40.     During the investigation, CV1's mother was upset that local law enforcement was not moving forward on CV1's allegations against GROVER.  On July 25, 2024, CV1's mother submitted on online tip to the FBI.  I received the tip and contacted SPD and VCSO.  I also made contact with the reporting parties, who informed me that another child, identified as CV3, had informed them that he had been victimized by GROVER.

14

41.     I contacted CV3 (DOB xx/xx/2005), and arranged to have CV3 forensically interviewed.  On August 12, 2024, law enforcement officers interviewed CV3.  It should be noted that CV3 is mentally challenged, operates on a 10–12-year-old level, and reportedly has an IQ of 72.

42.     On August 1, 2023, CV3 met GROVER while volunteering for the ORGANIZATION.  On August 5, 2023, when CV3 was a minor, GROVER instructed CV3 to go back into the backroom of the BUSINESS OFFICE.  While in the backroom, GROVER instructed CV3 to masturbate.  GROVER then pulled his own pants down and exposed his penis to CV3.  GROVER began masturbating and CV3 panicked and pushed a red button on a radio he was holding.  GROVER pulled his pants up and CV3 ran out of the room through an emergency exit door.

43.     On August 10, 2023, GROVER told CV3 that he could make a lot of money modeling.  GROVER showed CV3 pornography and told CV3 that he could get rich doing pornography.  GROVER stated he had a friend from the United Kingdom that was a photographer, and the friend visited GROVER twice a year.

44.     On August 18, 2023, CV3 was volunteering for the ORGANIZATION, and GROVER instructed CV3 to go into the backroom of the BUSINESS OFFICE.  CV3 said the exit door was barricaded, and CV3 observed a black Cannon recorder next to where the radios were charging.  CV3 grabbed the recorder and went to the bathroom.  While in the bathroom, CV3 said he observed several nude images of children ranging in ages from 12-17.

15

45.     When GROVER walked into the room, GROVER instructed CV3 to remove his clothing.  CV3 removed his clothing, and GROVER began to photograph CV3 using a black Cannon recorder.  GROVER forcibly removed CV3's underwear and put on blue latex gloves.  GROVER massaged CV3's testicles and then began to masturbate CV3.  CV3 said he pepper sprayed GROVER and exited the room. Sometime during the incident, CV3 said that GROVER threw the black Cannon recorder to the floor and broke it.  After this incident, CV3 was committed to a behavioral health center.

46.     On August 23, 2023, CV3 was released from the behavioral health center, and CV3's mother made CV3 go back and volunteer for the ORGANIZATION.

47.     On August 25, 2023, GROVER asked CV3 to go to the backroom of the BUSINESS OFFICE, and GROVER again sexually assaulted CV3.  CV3 turned 18 a few days after this, and CV3 continued to be sexually assaulted by GROVER until March of 2024.

48.     Prior to the interview, CV3 wrote notes that contained specific dates and information about GROVER's sexual assaults on CV3.  CV3 did not use his notes to recall the incidents discussed above.  I utilized the dates in the notes to match the incidents CV3 provided during his forensic interview.  Based on my training and experience, I believe that CV3 used a coping method of disassociation to mitigate the sexual trauma CV3 sustained from GROVER's sexual contact with CV3.  The statements made by CV3 were "stamped" with riotous vindication of CV3

16

escaping GROVER's victimization.  Although CV3 appeared to relay correct information about his sexual victimization at the hands of GROVER, CV3 appeared to engage in a fantasized accounting of how CV3 fought off GROVER during his sexual victimization.  Throughout the interview, CV3's body language indicated that CV3 was distraught and bothered as he recalled GROVER's victimization of CV3.

## CARNIVAL CRUISE LINE CONTACT

49.     After speaking with CV3, the FBI contacted Carnival Cruise Line to verify the dates that CV1 and CV2 traveled with GROVER.  Carnival Cruise Line provided information that CV1 traveled with GROVER on two cruises which departed from Port Canaveral, Florida, on January 6, 2023, and May 15, 2023.  Both cruises sailed from Port Canaveral, Florida, to Nassau, The Bahamas.  CV1 was victimized by GROVER on the May 15, 2023, cruise when CV1 was fifteen years old.

50.     Carnival Cruise Line also provided information that CV2 traveled with GROVER on May 20, 2022.  The cruise departed from Port Canaveral, Florida, to Nassau, The Bahamas.  CV2 was victimized by GROVER on that cruise when CV2 was sixteen years old.

51.     To gather more further information about CV1 and CV2 being victimized by GROVER, I requested an FBI Certified Adolescent Forensic Interviewer to re-interview CV1 and CV2 about their interactions with GROVER. CV2 was re-interviewed on August 16, 2024, and CV1 was re-interviewed on August 22, 2024.

52.     During the interview, CV2 stated he was taken on a cruise by

GROVER.  CV2 believed the cruise set sail around May 20, 2022.  At the time, CV2

stayed with a foster parent.  CV2 asked his foster parent if CV2 could go on a cruise

with GROVER, and the foster parent agreed.  GROVER stated he wanted to take

CV2 on a cruise as an award for CV2's grades.  GROVER claimed that he could not

take his adopted son because he had not gotten a COVID vaccine.  GROVER picked

up CV2 at his foster parent's residence and they drove to Port Canaveral, Florida.

53.     CV2 stated other individuals traveled with them from another non-

profit organization.  GROVER and CV2 boarded a Carnival Cruise Lines ship and

traveled to Nassau, The Bahamas.  CV2 shared a cabin with GROVER, and on the

first night CV2 slept in one bed and GROVER slept in the other bed.  The next night,

CV2 stated that GROVER asked the ship's crew to push the beds together.  CV2 did

not know why GROVER requested this, but stated "because he said I felt sick and

stuff."

54.     After CV2 and GROVER went to sleep with the beds pushed together,

CV2 stated that night GROVER touched CV2's "private area."  CV2 wore a long

shirt with no underwear to bed.  CV2 awoke to his night shirt raised to his waist and

GROVER masturbating CV2's penis.  CV2 grabbed GROVER's hand and tried to

remove it from his penis and told GROVER to stop.  CV2 moved away from

GROVER and fell asleep.  On the third night on the cruise, GROVER did not touch

CV2.  CV2 and GROVER spoke about what happened, and GROVER told CV2

that CV2 pushed GROVER's hand to CV2's penis.  While on the cruise, CV2 stated

18

that GROVER used his iPhone to take a picture of CV2 clothed.  GROVER stated

he would send the picture to CV2 after they got off the cruise.

55.     Later, when CV2 got out of a group home, CV2 often slept over at the

RESIDENCE because CV2 volunteered for the ORGANIZATION Grover ran.

When CV2 stayed at the RESIDENCE, GROVER would have CV2 sleep in

GROVER's bed.  CV2 stated that on these occasions GROVER touched CV2's penis

"a handful of times" while CV2 was asleep.  CV2 discovered GROVER touching

CV2's penis when CV2 awoke.  GROVER told CV2 "thank you for letting me play

with you."

56.     CV2 stated that he often showered in GROVER's bathroom.  CV2

recalled an incident in which GROVER was waiting for CV2 as CV2 finished

showering.  GROVER asked to shave CV2, and CV2 was confused, and GROVER

instructed CV2 to stand in the bathtub.  CV2 complied because GROVER was an

authority figure.  CV2 said that GROVER used a Phillips electric one blade with a

green and black handle.  CV2 said that the razor had the word "Pops" written on it.

CV2 noted that at the time CV2 was off his medications, and GROVER would not

let CV2 take the medications.  GROVER then shaved CV2's "private area," and then

placed his mouth on CV2's "dick."  CV2 stated it "felt weird as hell."  According to

CV2, GROVER was on his knees and was masturbating CV2's penis while

performing oral sex on CV2.  GROVER did this to CV2 on at least 2-3 other

occasions, repeating the shaving and sexual abuse on CV2.  CV2 said that GROVER

always stated "thank you for letting me play" after GROVER was pushed away by
CV2.

57.    CV2 stopped communicated with GROVER via text messages in
January of 2023.  CV2's mother owned a business near the BUSINESS OFFICE
where GROVER worked.  CV2's mother decided to move her business store, and
while that move was taking place GROVER spoke to CV2 and stated "If you tell
anyone your family won't believe you cause you are an autistic child" and "no one
will believe you and what you say."  CV2 stated GROVER was making sure CV2
did not tell anyone about CV2's sexual victimization at the hands of GROVER.

58.    CV2's mother learned about GROVER sexually victimizing another
child.  CV2's mother then confronted CV2, and CV2 told his mother that GROVER
had "sexually assaulted" him.  CV2 stated he had not shared any of the details of
what and how GROVER victimized him.  CV2 believed that GROVER had been
sexually active with other children.  CV2 identified CV1 and CV3 as potential
victims of the SUBJECT.  CV2 stated he learned about CV1 and CV3 from his
mother and CV1's mother.  CV2 stated that CV3 never came forward because
GROVER threatened CV3 the same way GROVER had threatened CV2.  CV2 has
never seen any other children being victimized, but CV2 did see GROVER grab
CV1's buttocks when he hugged CV1.

59.    CV2 said that GROVER tells people he is a therapist.  However, CV2
stated GROVER is not a licensed therapist.  CV2 said that GROVER utilized a room
at the BUSINESS OFFICE to conduct therapy sessions with special needs children.

20

The room is located in a backroom to the left of GROVER's desk when you enter the BUSINESS OFFICE. CV2 said the room is wired with cameras. CV2 stated GROVER often locked the doors and closed the blinds when he provided therapy to special needs children. CV2 did not know the names of the children GROVER provided counseling to.

60.     I reviewed the recorded interview of GROVER. During the interview, GROVER stated that CV2 has body issues and poor hygiene. While staying at the RESIDENCE, GROVER stated that he caught CV2 using GROVER's beard trimmer because GROVER found hair all over his bathroom floor. GROVER said he confronted CV2 about the matter, and instructed CV2 to "stand in the bathtub" when CV2 was shaving so that the hair did not get on the floor of the bathroom.

## SECOND FORENSIC INTERVIEW OF CV1

61.     During his interview, CV1 stated he went on two cruises with GROVER. CV1 confirmed that nothing sexual happened with GROVER on the first cruise. CV1 confirmed that he was sexually assaulted by GROVER on the second day of the second cruise.

62.     According to CV1, on the second day of his second cruise with GROVER, GROVER gave CV1 a razor as a gift. CV1 described the razor as black and green in color. CV1 was in the cabin when GROVER gave the razor to CV1 in a cardboard box. GROVER stated, "I can teach you how to use it," as CV1 opened the gift. CV1 stated that while being sexually victimized by GROVER on the cruise, GROVER left the room to buy baby oil. CV1 undressed and was naked. CV1

21

continued to shave his body while GROVER was gone. When GROVER returned to the room after he obtained the baby oil, CV1 was still shaving while sitting naked in a chair next to the cabin door, and GROVER proceeded to sexually abuse CV1.

63.     The only other person that CV1 spoke to about being sexually assaulted by GROVER was his ex-girlfriend. CV1's ex-girlfriend encouraged CV1 to tell his mother, and CV1 told his mother what GROVER had done. CV1 stated that he last saw the razor when CV1 brought it to the BUSINESS OFFICE for GROVER to cut CV1's hair. CV1 believed he left the razor at the BUSINESS OFFICE after GROVER cut his hair. CV1 stated his mother was present as GROVER cut CV1'S hair in a backroom at the BUSINESS OFFICE.

64.     CV1 stated the BUSINESS OFFICE consists of two changing rooms, two bathrooms, a supply room, another room, an office, and a personal therapy room. On many occasions, CV1 received therapy treatment from GROVER in a therapy room in the BUSINESS OFFICE. CV1 stated the door was closed during all of his therapy sessions. CV1 said the therapy room has an affixed camera that is over the door. CV1 did not know if the camera recorded the therapy sessions. During the sessions, GROVER often spoke about inappropriate stuff such as sex and adult pornography. GROVER told CV1 that watching pornography was good for CV1, which made CV1 feel uncomfortable. CV1 recalled a therapy session in which GROVER gave CV1 a black computer tablet containing adult pornography. GROVER left the room and closed the door. CV1 said he exited out of the pornography to watch YouTube videos. GROVER later returned and finished the

22

therapy session.  CV1 stated that GROVER never spoke to CV1 about the incident on the cruise.

65.     During CV1'S relationship with GROVER the two exchanged text messages.  I reviewed the text messages and throughout the text message exchange GROVER told CV1 that he loved him.  Below is a text message exchange in which GROVER told CV1 that GROVER wanted to get CV1 something special for his birthday.  CV1's birthday was weeks prior to the second cruise.  On May 31, 2023, the two exchanged the following text messages:

> CV1:  Sorry I missed the meeting yesterday I was sick
> CV1:  It's my birthday
> GROVER:  Happy Birthday BUTTHEAD!
> CV1:  Thanks
> GROVER:  I

## INTERVIEW OF CV1'S MOTHER

67.     During her interview with law enforcement officers, CV1's mother

stated that in March 2023 she spoke to GROVER about a gift that GROVER wanted

to buy CV1 for his 15th birthday.  GROVER stated that he wanted to buy CV1 hair

trimmers so that CV1 did not have to get haircuts all the time.  CV1's mother

thought this was a thoughtful gesture by GROVER.  CV1's mother stated that

GROVER gave CV1 the clippers during the cruise the two took together in May

2023.  CV1's mother last saw the clippers when CV1 and CV1's mother went to the

BUSINESS OFFICE.  CV1 brought the hair clippers in a cardboard box, and while

at the BUSINESS OFFICE, GROVER cut CV1'S hair in front of CV1's mother, and

she believed the clippers were accidently left in the cardboard box at the BUSINESS

OFFICE.

## TEXT MESSAGES WITH THE SUBJECT AND CV2

68.     GROVER also exchanged several text messages with CV2.  Based on

my training and experience, some of the text messages exchanged between

GROVER and CV2 are consistent with how subjects groom and entice minors to

interact with them.  Additionally, when CV2 was taken on the cruise where CV2

stated GROVER sexually victimized him, GROVER did not get the proper

permission from the court, which was necessary because CV2 was a ward of the

court at the time.  While reviewing the text messages between CV2 and GROVER, I

discovered a text message exchange on July 20, 2022, that talks about the court's

reaction to GROVER taking CV2 on a cruise:

24

> GROVER: "What happened at court yesterday?"
>
> CV2: "13 that I'm not able to go on any other cruises only with someone I can stay with that is my age. And the cabin. And basically just they got yelled at yesterday."
>
> GROVER: "Who got yelled at?"
>
> CV2: "Shannon and Randy and Bailee for not doing the correct way with the court order."
>
> GROVER: "Okay. Again not my fault."

69.    I discovered a text message exchange between CV2 and GROVER from August 5, 2022:

> GROVER: "Just wanted you to know I'm thinking about you today and I love you"
>
> CV2: (No response)

70.    In addition, GROVER often had CV2 work at GROVER's food trucks or do projects for the ORGANIZATION and at the BUSINESS OFFICE. This gave GROVER access to CV2, because CV2 often stayed at the RESIDENCE so that CV2 could go to work with GROVER the next day. I discovered a text message exchange between CV2 and GROVER from August 7, 2022:

> GROVER: "Thinking about you."
>
> CV2: "Thx"
>
> GROVER: "If your still there next weekend are they going to allow you to do food trucks? I hate your not getting any hours this week"
>
> CV2: "I can see if I'm going to be here next weekend but I'm not sure if I am being here."
>
> GROVER: "I'm hoping your at Tina's this week. But if not I have to know if I have to get more help for Dennis for food trucks."
>
> CV2: "Ik and hoping I am too"
>
> GROVER: "Just keep me updated. Love you."

> CV2: "I will love u too"

71.    I discovered a text message exchange between CV2 and GROVER from

August 19, 2022:

> GROVER: "Hey kiddo. Was going to call you today but time got away from me. Just wanted you to know I was thinking about you. Hope I can come for a visit soon and take you to lunch"
>
> CV2: (No Response)

72.    I discovered a text message exchange between CV2 and GROVER from

August 23, 2022:

> GROVER: "Hey you little butthead.... Just wanted to tell you I MISS you!"
>
> CV2: "I miss you too"
>
> GROVER: "Omg.... Your ALIVE! Lol. Have a bunch of new clothes for you I'm giving to Tina to put in your room."
>
> CV2: "Ok Thanks"

73.    I discovered a text message exchange between CV2 and GROVER from

September 12, 2022:

> GROVER: "Can't wait for you to get back here! I really miss you!"
>
> CV2: (No Response)

74.    I discovered a text message exchange between CV2 and GROVER from

October 22, 2022:

> GROVER: "O m g.... LOVE IT!!!!"
>
> GROVER: "Miss you dude!"
>
> CV2: "I know"
>
> CV2: "And I wanna say thank you."
>
> CV2: "I understand everything that you been doing not letting me be working at all the snap stuff. Like the group etc."

GROVER: "We will talk…. Just know I love you and your priority #1."

## SEARCH WARRANT EXECUTION

75.     On September 4, 2024, law enforcement officers executed a search warrant at the BUSINESS OFFICE and at the RESIDENCE.  Officers located inside the RESIDENCE a razor that had the word "Pops" written on it, consistent with the razor described by CV2.

76.     GROVER spoke with law enforcement officers at the BUSINESS OFFICE, and GROVER stated that officers would find a computer tablet at the RESIDENCE that contained pornography.  Officers did locate the computer tablet and were able to confirm it contained pornography.

77.     When executing the search warrant on the RESIDENCE, GROVER's brother was not home.  But GROVER's adopted son, an adult with a diminished mental capacity, was at the RESIDENCE, spoke with law enforcement officers, and stated that he and GROVER had gone on cruises, stayed in the same room, and pushed the beds together to sleep.

## CONCLUSION

78.     Based on the above information, there is probable cause to believe

GROVER violated 18 U.S.C. § 2243(a), Sexual Abuse of CV1, on or about May 16,

2023, within the special maritime jurisdiction of the United States.


_____

Kevin Kaufman
Special Agent
Federal Bureau of Investigation


Affidavit submitted by email and attested
to me as true and accurate by telephone or
videoconference consistent with
Fed.R.Crim. P. 41(d)(3) this
____5th____ day of September, 2024.


_____

HONORABLE LESLIE HOFFMAN PRICE
United States Magistrate Judge

28